Filed
D.C. Superior Court
08/80/2017 04:57AM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| TERRIS, PRAVLIK & MILLIAN, LLP,<br>1816 12th Street, NW, Suite 303<br>Washington, DC 20009-4422, and<br><br>SALLY GILLESPIE, as the Personal<br>Representative of the Estate of Bruce J. Terris,<br>1613 30th Street, NW, #S-3<br>Washington, DC 20007,<br><br>Plaintiffs,<br><br>.v.<br><br>THE HANOVER INSURANCE GROUP,<br>INC.,<br>440 Lincoln Street,<br>Worcester, MA 01653,<br><br>THE HANOVER INSURANCE COMPANY,<br>440 Lincoln Street<br>Worcester, MA 01653, and<br><br>THE HANOVER AMERICAN INSURANCE<br>COMPANY,<br>440 Lincoln Street<br>Worcester, MA 01653,<br><br>Defendants. | Civil Action No. 2017 CA 006028 B |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**I**

**INTRODUCTION**

1.      Plaintiffs purchased insurance policies from defendants (*see* para. 4 below), which

protected them from, *inter alia*, fraud and theft. Plaintiffs were defrauded and stolen from and

thereafter made claims against defendants for payment pursuant to the insurance policies. In

**EXHIBIT A**

response, defendants only made partial payments, and refused to pay the balance due under the policies. Plaintiffs hereby seek the balance due pursuant to claims for breach of contract.

## II

## PARTIES

2.    Plaintiff Terris, Pravlik & Millian, LLP ("TPM"), is a law firm located at 1816 12th Street, NW, Suite 303, Washington, DC 20009-4422. Until recently, TPM was located at 1121 12th Street, NW, Washington, DC 20005.

3.    Bruce J. Terris founded TPM. He owned the building located at 1121 12th Street, NW, Washington, DC 20005 and operated the business of renting the building under the name 1121 12th Street Properties ("1121 Properties"). At all times relevant to this case, the office of TPM was located at 1121 12th Street and TPM paid rent to 1121 Properties. Mr. Terris died on February 3, 2017. Sally Gillespie, who resides at 1613 30th Street, NW, #S-3, Washington, DC 20007, is the personal representative of the estate of Bruce J. Terris pursuant to the Letters of Administration of the Probate Division of the Superior Court of the District of Columbia issued on February 27, 2017 under Administration No. 2017 ADM 000183. Ms. Gillespie's claims in this case relate to insurance coverage purchased by Bruce J. Terris doing business as 1121 Properties. Therefore, to avoid confusion, the second plaintiff in this case is referred to below as "1121 Properties."

4.    Defendant The Hanover Insurance Group is an insurance group located at 440 Lincoln Street, Worcester, MA 01653. The website for The Hanover Insurance Group identifies various companies ("Our Companies"), including The Hanover Insurance Company, and listed below that, The Hanover American Insurance Company. The insurance policies at issue identify The Hanover Insurance Group and The Hanover American Insurance Company. If the Hanover Insurance Company or The Hanover American Insurance Company have an address that is

separate from The Hanover Insurance Group, that is unknown to plaintiffs. Accordingly, plaintiffs

identified all defendants in the caption as being located at 440 Lincoln Street, Worcester, MA

01653, and refers herein to all three entities as Hanover or defendants.

## III

## JURISDICTION

5.      This Court has subject matter jurisdiction over this case pursuant to D.C. Code 11-

921(a), which states, "[e]xcept as provided in subsection (b)," which is not applicable here, "the

Superior Court has jurisdiction of any civil action or other matter (at law or in equity) brought in

the District of Columbia."

6.      This Court has personal jurisdiction over Hanover because it sold insurance policies

in the District of Columbia to TPM and 1121 Properties.  D.C. Code 13-423(a)(1), (2), (6)

(jurisdiction over any person that "transact[s] any business in the District of Columbia,"

"suppl[ies] services in the District of Columbia," or "contract[s] to insure or act as surety for or on

any person, property, or risk, contract, obligation, or agreement located, executed, or to be

performed within the District of Columbia at the time of contracting, unless the parties otherwise

provide in writing").

## IV

## FACTS

### A.    THE INSURANCE POLICIES

7.      TPM purchased from Hanover insurance policies for the period from September 1,

2013, to September 1, 2014; September 1, 2014, to September 1, 2015; September 1, 2015, to

September 1, 2016; and September 1, 2016, to September 1, 2017. All of the terms cited below

are identical in the TPM policies with Hanover in these years. The policy from September 1, 2015,

to September 1, 2016, the period during which TPM made claims on Hanover related to this case,

is attached as Exhibit A and referred to below as the TPM Policy.  TPM also purchased from Hanover a new insurance policy for the upcoming period from September 1, 2017, to September 1, 2018.

8.      1121 Properties purchased from Hanover insurance policies for the period from September 1, 2013, to September 1, 2014; September 1, 2014, to September 1, 2015; September 1, 2015, to September 1, 2016; and September 1, 2016, to September 1, 2017.  All of the terms cited below are identical in the 1121 Properties policies with Hanover in these years.  The policy from September 1, 2015, to September 1, 2016, the period during which 1121 Properties made claims on Hanover related to this case, is attached as Exhibit B and referred to below as the 1121 Policy.  1121 Properties also purchased from Hanover a new insurance policy for the upcoming period from September 1, 2017, to September 1, 2018.

## B.      FRAUD COMMITTED BY TERRA GREEN

9.      Terra Green began work for TPM on or about March 25, 2013, as the Office and Information Technology Administrator.  She was trusted with the authority to carry out virtually all management, bookkeeping, financial, and insurance matters for TPM.  Part of Ms. Green's duties were to manage and pay bills for the 1121 building for Bruce J. Terris doing business as 1121 Properties.

10.      On July 6, 2015, Ms. Green was absent from TPM, claiming illness.  From that date until September 2, 2015, when her employment was terminated, Ms. Green never returned to the office.

11.      On or about August 26, 2015, during Ms. Green's extended absence, the owners of TPM discovered that Ms. Green's son, Al Johnson, was listed on TPM's health insurance bill as an employee of TPM.  Ms. Green had enrolled Mr. Johnson in TPM's health insurance plan on May 29, 2014, with an effective date of June 1, 2014.  Mr. Johnson was never an employee of

4

TPM and was not eligible for enrollment. On 15 occasions, Ms. Green used TPM funds to pay the cost of Mr. Johnson's monthly health insurance bill.

12.     Ms. Green was responsible for keeping the books for TPM in the firm's accounting software, Quickbooks. She had the responsibility for transmitting TPM employees' pre-tax payroll deductions for its SAR-SEP retirement program to the investment firm which holds the employees' accounts, Morgan Stanley. Ms. Green did not transmit all funds to the employee accounts at Morgan Stanley. Ms. Green created QuickBooks entries to make it appear that the appropriate payments had been sent.

13.     Ms. Green was issued a TPM credit card to pay for business expenses of TPM. On 411 occasions, Ms. Green used the BB&T credit card issued to her for unauthorized personal expenses, and then used TPM funds to pay those bills.

14.     Ms. Green was responsible for paying bills for TPM, including paying rent to 1121 Properties. Ms. Green had access to TPM's BB&T checking account and Bank of America business investment account, and had check-signing authority on TPM's BB&T checking account. Through on-line access, Ms. Green was able to move funds among TPM's bank accounts. On 22 occasions, Ms. Green made payments for her own personal expenses from TPM's BB&T checking account. Ms. Green covered up these payments by changing the payee in QuickBooks.

15.     Ms. Green was also responsible for managing the building at 1121 12th Street. In exchange for providing the management services of TPM's Office Administrator (who was Ms. Green during the period of her employment), TPM paid less rent than it otherwise would have to 1121 Properties. In this capacity, Ms. Green had access to three bank accounts for 1121 Properties: a SunTrust account; a Capital One 360 account, and a PNC account. The accounts for 1121 Properties were for operating the building (*i.e.*, receiving rent, paying the commercial loan on the

5

building, and paying taxes and other expenses). Through on-line access, Ms. Green was able to move funds from the bank accounts of TPM to the bank accounts of 1121 Properties. On 8 occasions, Ms. Green, without authority, withdrew money from TPM's Bank of America account, and using on-line banking functions, transferred the funds to the accounts of 1121 Properties. Ms. Green then withdrew funds from the accounts of 1121 Properties for her own purposes. Over this period, Ms. Green also provided false financial statements to the owners of TPM concerning the balance of funds in the Bank of America account. In addition, on 3 occasions, Ms. Green made extra payments from TPM's BB&T checking account to 1121 Properties in excess of the amounts due for the rent, and then withdrew the funds from the accounts of 1121 Properties for her own purposes.

16.     Through on-line access, Ms. Green was also able to move funds among the bank accounts of 1121 Properties. At the time that 1121 Properties' PNC account was opened in January 2014, Ms. Green was instructed by Bruce J. Terris to close the Capital One 360 and SunTrust accounts. She did not do so and used those two accounts to facilitate her theft of funds from 1121 Properties and TPM. On 51 occasions, Ms. Green, without authority, took money from the SunTrust account for her own purposes. This includes payments made directly to herself, payments of bills incurred by herself or other persons, and withdrawals of cash. On 5 occasions, Ms. Green, without authority, took money from the Capital One 360 account for her own purposes. This includes payments of Pepco bills incurred by herself or other persons, and a transfer of cash to a PNC account for herself.

17.     Ms. Green also used 1121 Properties' PNC account to open an ATM debit card, without authority, and cover personal expenses. On 17 occasions, Ms. Green, using the ATM debit card, took money from 1121 Properties' PNC account for her own purposes, including cash

withdrawals, payment to The Singer Law Firm for representation of her son in a legal matter, and payments to the U.S. Postal Service that appear to be for money orders.

18.     A subset of the theft from 1121 Properties' PNC account was excess payments to Anthony Laumer, who did business as Craftsman Remodeling. Part of Ms. Green's building management duties included arranging and overseeing the maintenance and upkeep of the 1121 12th Street building. Mr. Laumer was hired by Ms. Green to perform such maintenance on the building. Mr. Laumer was listed by Ms. Green as her spouse or partner on her health insurance form in her personnel file. On 3 occasions, Ms. Green made payments to Mr. Laumer or Craftsman Remodeling which were not related to any services performed to maintain or repair the building at 1121 12th Street.

19.     After discovering the inclusion of Ms. Green's son, Al Johnson, on TPM's health insurance policy, TPM and 1121 Properties retained Gelman, Rosenberg & Freedman, a CPA firm, to identify and assess the extent of fraud committed by Ms. Green on TPM and 1121 Properties. This was necessary because Ms. Green changed financial reports to hide her embezzlement. The forensic accounting work cost $30,065.11.

C.     **LOSSES SUFFERED BY TPM AND 1121 PROPERTIES AS A RESULT OF MS. GREEN'S FRAUD**

20.     TPM requested that Hanover compensate it pursuant to the Employee Dishonesty provision of the TPM Policy to cover losses sustained because of Ms. Green's fraud described above, and it provided Hanover with documentation supporting that request. Those loses included (1) $86,000, which Ms. Green embezzled from TPM's Bank of America business investment account; (2) $49,470.54, which Ms. Green embezzled from TPM's BB&T checking account; (3) $32,260.51, which Ms. Green charged to the TPM business credit card for her personal expenses; and (4) $6,403.54 in TPM funds used by Ms. Green to pay for health insurance premiums for her

son, Al Johnson. These four series of occurrences total $174,134.59. Hanover paid TPM $50,000 toward those losses.

21.   Ms. Green stole substantial funds from 1121 Properties, for which 1121 Properties provided Hanover documentation. Hanover paid 1121 Properties $10,000 toward those losses under a Theft provision of the 1121 Policy. 1121 Properties is not seeking further payment from Hanover regarding those losses.

22.   In addition, as described above (para. 19), it cost $30,065.11 in forensic accounting work to identify and assess the fraud on TPM and 1121 Properties. TPM and 1121 Properties requested that Hanover compensate them for those expenses pursuant to the Claims Expense provision of the two insurance policies and provided Hanover with documentation supporting those requests. Each policy has a Claims Expense coverage limit of $10,000. Hanover paid TPM $9,613.42, and 1121 Properties $1,971.30, toward these losses.

23.   TPM and 1121 Properties also suffered other losses as a result of Ms. Green's fraud, which are not the subject of this suit.

**D.   RELEVANT PROVISIONS OF THE INSURANCE POLICIES**

24.   Below are relevant provisions of the TPM Policy and the 1121 Policy.

25.   The table below includes provisions relevant to TPM's Employee Dishonesty claims under the TPM Policy, which are referenced in paragraph 20 above.

| Provision | Page Numbers in TPM Policy[1] |
|---|---|
| 5. Additional Coverages | TPM Policy, pp. 26, 37 |

---

[1] Plaintiffs refer herein to the page numbers stamped on the upper left-hand corners of the TPM Policy and the 1121 Policy.

Unless otherwise stated, payments made under the following Additional Coverages will not increase the applicable limits of insurance. All policy Exclusions, Limitations and Conditions apply unless otherwise stated.

\*   \*   \*

**p. Employee Dishonesty including ERISA Compliance**

(1) We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest or criminal acts committed by any of your "employees" acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

(a) Cause you to sustain loss or damage; and also

(b) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(1) Any "employee"; or

(2) Any other person or organization.

\*   \*   \*

(3) The most we will pay for loss or damage in any one "occurrence" is $10,000 or the amount shown in the Additional Property Coverage Schedule. This Additional Coverage is not subject to the Limits of Insurance for Section I - Property.

(4) All loss or damage:

(a) Caused by one or more persons; or

(b) Involving a single act or series of acts; is considered one "occurrence"

\*   \*   \*

(7) We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

(8) If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered

| | |
|---|---|
| under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Additional Coverage, provided:<br><br>    (a) The Additional Coverage became effective at the time of cancellation or termination of the prior insurance; and<br><br>    (b) The loss or damage would have been covered by this Additional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred. | |
| **D. Deductibles.**<br><br>    1. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance of **Section I – Property.**<br><br>    *       \*       \*<br><br>    5. A \$1,000 Deductible applies to the following Additional Property Coverages and Extensions of Coverage:<br><br>    a. "Employee" Dishonesty (except ERISA Compliance) * * *. | TPM Policy, p. 57 |
| **G. Property Definitions**<br><br>    *       \*       \*<br><br>20. "Occurrence" means all loss or damage that is attributable directly or indirectly to:<br><br>    a. One cause, act, event or series of similar, related causes, acts or events involving one or more persons; or<br><br>    b. One cause, act or event, or a series of similar related causes, acts or events not involving any person. | TPM Policy, pp. 62, 65 |
| **8. Employee Dishonesty including ERISA Compliance.**<br><br>Under Section I - Property A.5. Additional Coverages, p. Employee Dishonesty, paragraph (3) is replaced by the following:<br><br>    (3) The most we will pay for loss or damage in any one "occurrence" is \$50,000 or the amount shown in the Additional Property Coverage | TPM Policy, p. 105 |

| | |
|---|---|
| Schedule. The amount payable under this Additional Coverage is not subject to the Limits of Insurance for Section I - Property. | |

26.    The table below includes those provisions that are relevant to plaintiffs' Claims Expense claims under the TPM Policy and the 1121 Policy, which are referenced in paragraph 22 above.

| Provision | Page Numbers in Policies |
|---|---|
| **4. Claims Expense** <br><br> **Under Section I - Property A. 6. Coverage Extensions, j. Inventory and Loss Appraisal is deleted and replaced with:** <br><br> **j. Claims Expense** <br><br> (1) We will pay all reasonable expenses you incur at our request to assist us in: <br><br>     (a) The investigation of a claim; <br><br>     (b) The determination of the amount of loss, such as taking inventory; or <br><br>     (c) The cost of preparing specific loss documents and other supporting exhibits. <br><br> (2) We will not pay for expense: <br><br>     \*    \*    \* <br><br>     (d) To prepare claims not covered by this policy \* \* \* <br><br>     \*    \*    \* <br><br> (3) The most we will pay under this coverage extension per "occurrence" is $10,000 per affected location.[2] | TPM Policy, p. 104; 1121 Policy, pp. 101-102. |

---

[2] All of these terms are identical in the TPM Policy and the 1121 Policy, except that this is paragraph 4 in the TPM Policy, and paragraph 7 in the 1121 Policy, and subparagraph 3 under the TPM policy is stated in the text above and subparagraph 3 under the 1121 Policy states: "The most we will pay under this coverage extension $10,000 [*sic*]."

| |
|---|
| (4) The deductible does not apply to this Coverage Extension[.] |

## E.    DISPUTED CLAIMS MADE FOR COVERAGE UNDER THE POLICIES

27.    After identifying Ms. Green's fraud and theft with the assistance of Gelman, Rosenberg & Freedman, on December 1, 2015, TPM and 1121 Properties submitted to Hanover Proof of Loss documents for compensation pursuant to their respective policies. Hanover issued its initial decision on the claims of TPM and 1121 Properties on May 26, 2016. The parties exchanged further correspondence about the matter in 2016 and early 2017. Hanover paid small additional amounts under the Claims Expense coverage to TPM and 1121 Properties in January 2017.

### 1.    TPM's Claim under the Employee Dishonesty Provision

28.    As explained above (para. 20), TPM suffered substantial losses that are compensable under the Employee Dishonesty provision (*see* para. 25). The four series of losses listed in paragraph 20 above are separate occurrences, each of which is separately subject to the $50,000 per occurrence cap in the policy. In the language of the policy (*see* para. 25 above), they are each a different series of acts: (1) the embezzlement from the Bank of America account; (2) the embezzlement from the BB&T checking account; (3) the personal use of a TPM credit card; and (4) the fraudulent enrollment of Ms. Green's son in health insurance as an employee of TPM. Each of these series of acts is made up of fraudulent acts on different dates at different times. Moreover, each of these series of acts are unique from one another, and each of them are independently fraudulent. The $50,000 occurrence cap applies to each occurrence—that is, to each series of acts described above (para. 20).

29.    The table below shows that Hanover owes TPM an additional $88,134.59 for these losses under the Employee Dishonesty provision of the TPM Policy.

| Occurrence | TPM's Losses | Total Toward $50,000 Cap Per Occurrence |
|---|---|---|
| Embezzlement from TPM's Bank of America business investment account | $86,000.00 | $50,000.00 |
| Embezzlement from TPM's BB&T checking account | $49,470.54 | $48,470.54, after application of the $1,000 deductible |
| Personal use of Ms. Green's TPM business credit card | $32,260.51 | $31,260.51, after application of the $1,000 deductible |
| Fraudulently enrolling Ms. Green's son in TPM's health plan as a TPM employee, at TPM's expense | $6,403.54 | $5,403.54, after application of the $1,000 deductible |
| Total | | $135,134.59 |
| Total Paid to TPM | | ($50,000.00) |
| **Total Due to TPM Related to the Employee Dishonesty Provision** | | **$85,134.59** |

2.    **TPM's and 1121 Properties' Claims under the Claims Expense Provision**

30.    As described above (paras. 19, 22), it cost $30,065.11 in forensic accounting fees to identify and assess the fraud. There is a $10,000 cap under the Claims Expense provision of each policy (*see* para. 26 above). In its September 16, 2016, letters to TPM and 1121 Properties, Hanover explained:

> As outlined in item (d) above [*see* para. 26 above], we are unable to pay for Claims Expenses for claims not covered by this policy. Therefore, since a policy of $10,000 applies, a pro-rate [*sic*] approach was taken to determine the amount due to you. [emphasis added]

31.    Hanover's September 16, 2016, letter to TPM further explained:

> The following calculation was used based on your claim expenses of $28,849.66[3] which determined that a theft in the amount of $166,933.49 occurred:
>
> $28,849.66 divide by $166,933.49 = $0.172821283
>
> $0.172821288 x $50,000 = $8641.06 Claims Expense Payment

---

[3] At the time of that correspondence, that was the total amount of forensic accounting fees that had been submitted to Hanover for reimbursement.

Therefore, Hanover paid TPM $8,641.06 under the Claims Expense provision. Hanover subsequently paid TPM an additional $972.36 under this provision to cover work that Gelman Rosenberg & Freedman did at Hanover's request in March 2016. This totals $9,613.42; $386.58 remains unpaid under the TPM Claims Expense coverage.

32.    Hanover's September 16, 2016, letter to 1121 Properties concerning the Claims Expense coverage under the 1121 Properties policy stated:

The following calculation was used based on your claim expenses of $28,849.66 which determined that a theft in the amount of $166,933.49 occurred:

$28,849.66 divide by $166,933.49 = $0.172821283

$0.172821288 x $10,000[4] = $1728.21 Claims Expense Payment

Therefore, Hanover paid 1121 Properties $1,728.21 under the Claims Expense provision. Hanover subsequently paid 1121 Properties an additional $243.09 under this provision to cover work that the accounting firm did at Hanover's request. That totals $1,971.30; $8,028.70 remains unpaid under the 1121 Properties Claims Expense coverage.

33.    TPM's and 1121 Properties' claims related to Ms. Green's embezzlement have been covered by the policies with Hanover. TPM's claim under the Employee Dishonesty Provision was covered—there is just a dispute regarding the amount of the payment, as described above. 1121 Properties' claim under the Theft provision of the 1121 Policy was covered. The actual Claims Expense incurred by TPM and 1121 Properties to their CPA firm Gelman Rosenberg & Freedman exceeds $20,000 (the policy limit for Claims Expenses under both policies added together). There is no basis in either policy for Hanover's refusal to pay the Claims Expenses up to the policy limit and instead to apply a *pro rata* reduction.

---

[4] $10,000 was paid to 1121 Properties pursuant to the Theft provision in the 1121 Policy. *See* para. 21 above.

34.     Hanover owes TPM $386.58, which is the balance of money due up to the $10,000

Claims Expense coverage limit.  Hanover owes 1121 Properties $8,028.70, which is the balance

of the money due up to the $10,000 Claims Expense coverage limit.

### V

### CLAIMS

#### Claim 1

#### Claim by TPM for Breach of Contract for Failing to Pay Pursuant to the Employee Dishonesty Provision

35.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

herein.

36.     The insurance policies that TPM purchased from Hanover are contracts.  TPM

suffered substantial losses as a result of Ms. Green's embezzlement.  The contracts cover those

losses up to $50,000 per occurrence under the Employee Dishonesty provision.  TPM requested

payment for those losses from Hanover and provided supporting documentation.  Hanover paid

TPM $50,000 under the Employee Dishonesty provision, but failed to pay TPM the additional

$85,134.59 still due under that provision.

#### Claim 2

#### Claim by TPM for Breach of Contract for Failing to Pay Pursuant to the Claims Expense Provision

37.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

herein.

38.     TPM accrued substantial forensic accounting expenses to identify and assess Ms.

Green's fraud.  The contracts cover such losses up to $10,000.  TPM requested payment for those

losses from Hanover and provided supporting documentation.  Hanover paid TPM $9,613.42 under

the Claims Expense provision, but failed to pay TPM an additional $386.58 still due under that provision.

### Claim 3

### Claim by 1121 Properties for Breach of Contract for Failing to Pay Pursuant to the Claims Expense Provision

39.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

40.     The insurance policies that 1121 Properties purchased from Hanover are contracts. 1121 Properties, together with TPM, accrued substantial forensic accounting expenses to identify and assess Ms. Green's fraud. The contracts cover such losses up to $10,000. 1121 Properties requested payment for those losses from Hanover and provided supporting documentation. Hanover paid 1121 Properties $1,971.30 under the Claims Expense provision, but failed to pay 1121 Properties an additional $8,028.70 still due under that provision.

### VI

### RELIEF

41.     TPM requests that this Court order Hanover to pay TPM $85,134.59 pursuant to the Employee Dishonesty provision of the TPM Policy, and $386.58 pursuant to the Claims Expense provision of the TPM Policy, totaling $85,521.17.

42.     1121 Properties requests that this Court order Hanover to pay 1121 Properties $8,028.70 pursuant to the Claims Expense provision of the 1121 Policy.

43.     TPM and 1121 Properties also request payment of any other compensatory damages, consequential damages, interest, and attorneys' fees and costs, which may also apply, and any other relief that is equitable and appropriate.

16

## VII

## JURY DEMAND

44.     TPM and 1121 Properties demand a jury trial in this action of all issues triable by

a jury.

Respectfully submitted,

*/s/ Todd A. Gluckman*
CAROLYN SMITH PRAVLIK (D.C. Bar No. 334102)
TODD A. GLUCKMAN (D.C. Bar No. 1004129)
TERRIS, PRAVLIK & MILLIAN, LLP
1816 12th Street, NW, Suite 303
Washington, DC 20009-4422
tgluckman@tpmlaw.com
(202) 204-8482

August 30, 2017                         *Counsel for Plaintiffs*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

TERRIS, PRAVLIK & MILLIAN, LLP, *et al.*   )
   )
              Plaintiffs,   )
   )
           v.   )  Civil Action No. **2017 CA 006028 B**
   )
THE HANOVER INSURANCE GROUP,  )
INC., *et al.*   )
   )
           Defendants.   )
   )

**DISCLOSURE STATEMENT OF PLAINTIFF TERRIS, PRAVLIK & MILLIAN, LLP**

Pursuant to Rule 7.1 of the District of Columbia Superior Court Rules of Civil Procedure,

the undersigned counsel hereby certifies that Terris, Pravlik & Millian, LLP ("TPM"), is a limited

liability partnership registered in the District of Columbia and owned by its equity partners,

Carolyn Smith Pravlik, Kathleen L. Millian, Zenia Sanchez Fuentes, Patrick A. Sheldon, and Todd

A. Gluckman. Because TPM is a partnership, not a corporation, it is not required to make any

disclosures pursuant to Rule 7.1. In any event, TPM discloses that it has no parent corporation

and has no stock.

Respectfully submitted,

*/s/ Todd A. Gluckman*
KATHLEEN L. MILLIAN (D.C. Bar No. 412350)
TODD A. GLUCKMAN (D.C. Bar No. 1004129)
TERRIS, PRAVLIK & MILLIAN, LLP
1816 12th Street, NW, Suite 303
Washington, DC 20009-4422
tgluckman@tpmlaw.com
(202) 204-8482

August 30, 2017          *Counsel for Plaintiffs*




001

TERRIS PRAVLIK & MILLIAN LLP
1121  12TH ST NW
WASHINGTON, DC  20005

TERRIS PRAVLIK & MILLIAN LLP
1121 12TH ST NW
WASHINGTON, DC  20005

TERRIS PRAVLIK & MILLIAN LLP
1121 12TH ST NW
WASHINGTON, DC  20005